# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**STANLEY J. VROOMAN,**

    **Plaintiff,**

    **v.**                               **Case No. 19-CV-1452-SCD**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

---

## DECISION AND ORDER

---

Stanley Vrooman applied for Social Security benefits in 2017, alleging that he is disabled based on chronic pain in his back, hips, pelvis, and knee, as well as dizziness. Following a hearing, an administrative law judge (ALJ) denied benefits in 2018, finding that Vrooman remained capable of working notwithstanding his impairments. Vrooman now seeks judicial review of that decision, arguing that the ALJ erred in evaluating his alleged symptoms, weighing the medical opinion evidence, and failing to account for all his limitations. The Commissioner contends that the ALJ did not commit an error of law in reaching her decision and that the decision is otherwise supported by substantial evidence. I agree with the Commissioner. Accordingly, the Commissioner will be affirmed.

## BACKGROUND

Vrooman was born on April 10, 1966. R. 37.[1] From 2002 to 2006, he worked for U.S. Cellular handling complaints from disgruntled customers. R. 40, 91. After that, he worked for a few years as an insurance salesman before he got a job at Time Warner Cable. R. 91. While

---

[1] The transcript is filed on the docket at ECF No. 14-3 to ECF No. 14-16.

installing cable in October 2011, Vrooman fell off a roof and fractured his right humerus, his pelvis, and his lumbar vertebra. *See* R. 40, 293, 715, 727, 808, 828. He underwent open reduction and internal fixation surgery to repair the broken bones. R. 344. After about a year of rehab, Vrooman attempted to return work; however, upon realizing that he was no longer up to the task physically, Time Warner transferred him to a retention specialist position. R. 40–41. He also continued to deliver newspapers on the side, a job he had done since 1996. *See* R. 39, 41, 243.

The sitting required of the retention specialist job proved difficult for Vrooman, so in January 2014, at the advice of his doctor, he had the pins removed from the back of his pelvis. R. 41, 57–58, 425. The hardware-removal surgery did not go well: Vrooman did not obtain any pain relief, and he developed dizziness that has never subsided. R. 41–42. Because of these symptoms, he was unable to return to Time Warner. R. 39, 41. In October 2015, Vrooman attempted to return to work; he got a job at Walmart as a part-time cashier. R. 39. However, the store closed in April 2016, and he couldn't get hired at a new store due to his limitations in hours and ability to work. *See* R. 44, 242–43.

In early 2017, Vrooman applied for disability insurance benefits and supplemental security income from the Social Security Administration (SSA). R. 188–99. Vrooman asserted that he was unable to work due to the following medical conditions: sacroiliac (SI) joint dysfunction of the left side, lumbar disc herniation with radiculopathy, degenerative joint disease of the knee, pain in forearm joint, vestibular dysfunction, Type 2 diabetes, and hypertension. R. 241. After his applications were denied at the local level, *see* R. 60–107, Vrooman requested an administrative hearing before an ALJ, *see* R. 108. Vrooman, who was not represented by an attorney at the time, appeared by video before ALJ Pearline Hardy on

2

September 14, 2018. R. 26–59. At the time of the hearing, Vrooman was living in an apartment in West Bend, Wisconsin, with his wife. R. 37, 42. He amended his alleged onset date to January 10, 2014, the day of his hardware-removal surgery. R. 38.

Vrooman testified that his impairments caused debilitating pain and dizziness. *See* R. 41–49. He indicated that he could sit for only twenty to thirty minutes at a time before he needed to stand. R. 42. When asked about household duties such as cooking and cleaning, Vrooman replied,

> [I]t's kind of a group effort [better me and my wife, who has degenerative arthritis herself]. We both do a little bit here and a little bit there, whatever we can manage. Whoever is having a better day, we try to do—like she usually does the dishes because I can't stand there that long. I'll do the vacuuming because it's more moving and she doesn't move very well. And we kind of take care of each other that way. I tell her not to do so much and she tells me not to do so much and neither one of us listen to each other.

R. 42–43. Vrooman stated that, since being diagnosed in 2014 with degenerative joint disease in his knee, he has used "a cane for balance and to help with relieving pressure from [his] hip." R. 43. Nevertheless, the problems with his legs "continu[e] to get worse." *Id.* When asked if he could perform a sit-down job that allowed him to stand as often as he needed to, Vrooman replied,

> Well, I would only be able to perform it in a very limited amount of hours per day. And if—what happens is like if I sit up and try to do something or I go grocery shopping or something like that, that usually makes it so that I can't do anything the next day. So, I don't feel that that would work very well because of the amount of pain, the moving up and down, and then having—if I worked five days in a row, there would be no way I would recover in time to go the next week on just a two-day weekend.

R. 43–44. Vrooman stated that his diabetes was getting better. R. 45. Regarding the dizziness, he indicated that certain stimuli, like being tired, walking, turning his head, or bending over, "will bring it on," but other times he has "no idea why [it happens]." R. 45–46. For example,

3

his "last serious bout started while [he] was just laying [sic] down." *Id.* And aside from the dizziness attacks, he reported "there is always a little bit of fuzziness." *Id.* Vrooman indicated that he had a burning sensation in his left leg that was worse with standing. R. 46–47. He also reported difficulties reaching overhead, handling, fingering, and moving his head backwards. R. 47–48. Overall, Vrooman indicated that his life has been "very challenging" over the past four years, as the dizziness "could take [him] out for weeks at a time" and "the pain is a daily, every day, constant." R. 49.

The ALJ also heard testimony from Sara Statz, an impartial vocational expert. *See* R. 49–58. Statz testified that Vrooman had four past relevant jobs: a cable television installer, a cashier/checker, a newspaper carrier, and a customer complaint clerk. R. 51–53. According to Statz, a hypothetical person with Vrooman's age, education, and work experience could still perform the customer complaint clerk job—but not the others—if he were limited to a restricted range of sedentary work R. 53–56. That person could also perform other jobs, including, for example, as an addresser and a document preparer. R. 54–55, 58. However, all work would be precluded if that person were off task at least twenty percent of the time. R. 56.

Applying the standard five-step process, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), on November 19, 2018, the ALJ issued a written decision concluding that Vrooman was not disabled. *See* R. 8–25. The ALJ determined that Vrooman had not engaged in substantial gainful activity since January 10, 2014, his amended alleged onset date. R. 13. The ALJ found that Vrooman's physical impairments (degenerative disc disease of the back and multi-level facet arthropathy, left sacroiliac joint dysfunction, vestibular disturbance, and diabetes mellitus with peripheral neuropathy) limited his ability to work but didn't meet or equal the

4

severity of a presumptively disabling impairment. R. 14–15. The ALJ next determined that Vrooman had the residual functional capacity (RFC) to perform sedentary work with the following additional limitations or allowances:

- He needs the option to sit/stand at will, as long as he's not off task or away from the workstation;

- He can operate hand controls frequently bilaterally;

- He is limited to frequent handling of items bilaterally;

- He can never climb ladders, ropes, or scaffolds;

- He can occasionally climb ramps and stairs;

- He can occasionally balance, stoop, crouch, and crawl;

- He can never work at unprotected heights;

- He can occasionally work with moving mechanical parts;

- He can occasionally be exposed to extreme cold and vibration; and

- He can occasionally extend his neck, defined as movement of the neck backwards.

R. 15. In assessing his RFC, the ALJ determined that Vrooman's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. 16. As for the medical opinion evidence, the ALJ gave "little weight" to the opinions of the non-examining state-agency medical consultants and "some weight" to the opinions of Vrooman's treating provider, Mark England, MD. R. 19–20. The ALJ determined that, in light of the above RFC, Vrooman could perform his past job as a customer complaint clerk; therefore, he was not disabled. R. 20–21.

After the SSA's Appeals Council denied review, *see* R. 1–5, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502,

506 (7th Cir. 2016), Vrooman filed this action on October 3, 2019. ECF No. 1. The matter was reassigned to me in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 20, 21. The matter is fully briefed and ready for disposition. *See* ECF Nos. 15, 19, 22.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also

6

is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Vrooman contends the ALJ erred in (1) evaluating the intensity, persistence, and limiting effects of his alleged symptoms, (2) weighing the medical opinion evidence, and (3) failing to account for all his limitations in the RFC assessment.

## I.    The ALJ's Evaluation of Vrooman's Alleged Symptoms

Vrooman first argues that the ALJ improperly discounted his subjective allegations of disabling symptoms. *See* ECF No. 15 at 12–16.

ALJs employ a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling (SSR) 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings

8

and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

The ALJ here credited many of Vrooman's subjective complaints but found that his allegations of significant physical limitations were not supported by the medical record. According to the ALJ, Vrooman's conditions remained "generally stable" and improved with "routine" treatment. *See* R. 16–19. The ALJ also determined that Vrooman's "physical examinations and imaging showed generally stable findings." R. 16. For example, although at times Vrooman demonstrated sensory abnormalities, tenderness of the SI joint and lumbar spine, and an antalgic gait during his exams, he also had normal strength, a negative straight-leg raise, normal muscle tone, intact sensation, clear speech, and an excellent memory. *See* R. 16–19. Similarly, imaging studies revealed only mild degenerative disc disease and disc bulges, mild brain atrophy and lesions, degenerative changes in the pelvis and left SI joint, and a mild neurological lesion of the nerve root. R. 16–18. The ALJ also considered Vrooman's activities, including working twenty hours per week at Walmart, carrying a tire six blocks when he got a flat, and walking two blocks to take out the garbage. R. 17–18.

Vrooman maintains that the ALJ's subjective-symptom evaluation is not supported by substantial evidence. He first takes issue with the ALJ's characterization of his treatment as "routine," noting that his "residual impairments . . . have been treated (unsuccessfully) by multiple physical therapy attempts, injections, and prescribed medications." ECF No. 15 at 13. I see no error in the ALJ's use of that adjective. The Social Security regulations list treatment, including medication, as a factor that ALJs should when evaluating subjective symptoms, *see* 20 C.F.R. § 404.1529(c)(3)(iv)–(v), 416.929(c)(3)(iv)–(v), and the ALJ accurately noted that Vrooman's conditions have primarily been treated with medication

management and injection therapy, *see* R. 16. It was reasonable for the ALJ to characterize that treatment as routine. *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (quoting *Singh v. Apfel*, 222 F.3d 448, 450 (8th Cir. 2000)) ("[T]he epidural steroid injections were the most invasive treatment [Plaintiff] received for her back pain, and those injections have been characterized as 'conservative treatment.'"). The ALJ did not, as Vrooman suggests, imply that lack of surgical intervention undercut Vrooman's degree of pain and associated limitations.

Vrooman next accuses the ALJ of misconstruing the record when she determined that Vrooman's conditions were generally stable and improved with treatment. ECF No. 15 at 13–15. According to Vrooman, a stable condition is simply one that hasn't changed; it doesn't mean that he was asymptomatic. It's true that having a "stable" condition doesn't necessarily mean one is capable of gainful employment. After all, someone in a coma may be described as stable. Here, in using the term "stable," the ALJ never implied that Vrooman's treatment completely relieved his symptoms. Rather, in concluding that Vrooman was not as functionally limited as he alleged, the ALJ accurately noted several instances when Vrooman reported improvement with treatment or stability in symptoms with medication. *See* R. 17–19. For example, the record shows that Vrooman's diabetes and hypertension were controlled by medication, R. 343, 739, that Voltaren gel helped alleviate some of his knee pain, R. 708, and that therapy was helpful with his vestibular dysfunction, R. 629, 658, 663–67. Vrooman also reported some improvement with his neuropathic pain, R. 343, including stating in April 2017 that "[h]is pain is overall manageable," R. 708.

Vrooman counters with treatment records that he claims demonstrate worsening or variable pain. *See* ECF No. 15 at 14–15. But throughout her decision the ALJ did note times

when Vrooman reported increased pain. *See* R. 16–19. The ALJ reasonably concluded that, despite these periodic variations in reported symptoms, Vrooman's conditions were *generally* stable *with* manageable pain such that he was capable of performing a restricted range of sedentary work. Vrooman has not demonstrated that this finding was impermissibly based on a one-sided view of the evidence.

Finally, Vrooman challenges the ALJ's reliance on observations made during physical exams, noting times when he demonstrated a slow and antalgic gait, left SI joint tenderness, left leg weakness, and decreased sensation in his lumbar spine. *See* ECF No. 15 at 15. But again, the ALJ explicitly considered these findings in her decision and reasonably determined that they greatly reduced Vrooman's functional abilities, though not to the degree alleged. *See* R. 14, 16–18. Vrooman essentially asks that I reweigh this evidence and substitute my own opinion for that of the ALJ. However, I am not entitled to do so. *See Skarbek*, 390 F.3d at 503 (citing *Lopez*, 336 F.3d at 539).

In sum, Vrooman has failed to demonstrate that the ALJ's decision to discredit some of his alleged symptoms lacks explanation or support in the record. I therefore find no error in the ALJ's decision to not fully credit Vrooman's complaints of disabling symptoms.

## II.     The ALJ's Evaluation of the Medical Opinion Evidence

Vrooman next argues that the ALJ erred in rejecting the opinion of his treating provider, Dr. England. *See* ECF No. 15 at 16–19.

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845

11

F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. *See* §§ 404.1527(c), 416.927(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Only "the most patently erroneous reasons for discounting a treating physician's assessment" require reversal. *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)).

Dr. England, a specialist in physical medicine and rehabilitation, began treating Vrooman in November 2014. *See* R. 696, 701. He has seen Vrooman four to six times per year since then, treating his multiple pain complaints. R. 696. On February 9, 2017, Dr. England completed a Residual Functional Capacity Form in support of Vrooman's disability claims. *See* R. 696–701. Dr. England indicated (among other things) that Vrooman could stand and sit for about twenty to thirty minutes at a time, respectively, and that Vrooman was unable to sit upright for six to eight hours. R. 697–98. Dr. England further indicated that Vrooman could lift five to ten pounds and that Vrooman had some limitation reaching and handling. R. 698. According to Dr. England, Vrooman could perform "sedentary level of work allowing frequent position changes [and] frequent breaks." R. 700.

12

The ALJ assigned some weight to the opinions contained in the RFC Form. R. 20. The ALJ determined that Dr. England's opinions regarding Vrooman's need to frequently alternate between sitting and standing, lifting capability, and limitation with handling were generally consistent with the record. *Id.* However, according to the ALJ, Dr. England's opinion that Vrooman "was not capable of sitting six hours . . . is not consistent with the claimant's treatment records." *Id.* The ALJ noted that, while Vrooman "reported increased symptoms with standing and walking, . . . the record does not document significant difficulties with prolonged sitting with the ability to alternate positions at will." *Id.*

Vrooman maintains that the ALJ ignored evidence showing that he had significant difficulties with prolonged sitting regardless of whether he was allowed to switch positions. *See* ECF No. 15 at 18. However, the evidence he cites does not support this argument. The first treatment noted cited, where Vrooman was observed to be "uncomfortable in office [with] need to change position and prefers standing for most of visit," R. 346, is actually consistent with the ALJ's conclusion that the record did not demonstrate significant difficulties with prolonged sitting *if allowed to alternate positions at will*—an allowance the ALJ included in the RFC, *see* R. 15. Vrooman also cites several visits where Vrooman mentioned having an "episode" of dizziness while sitting. *See, e.g.*, 602, 622, 628. But Dr. England indicated that Vrooman's inability to sit upright for six to eight hours was due to "pain maintaining any position for long"; he didn't mention Vrooman's dizziness episodes. R. 698. The last evidence Vrooman cites are his disability and function reports, where he claimed that he needed a twenty- to thirty-minute break after sitting for less than an hour. R. 262, 268. The ALJ, however, reasonably credited instead Vrooman's hearing testimony that, if he needed to sit for a prolonged period, he could manage his pain by standing up after sitting for twenty to

13

thirty minutes. *See* R. 16 (noting Vrooman's allegation that "[h]e can sit for 20–30 minutes and then needs to stand"); *see also* R. 42 (when asked at the hearing how long he could sit, Vrooman replied, "Roughly 20 to 30 minutes at a time, and then I stand up for a while if I have to continue sitting."). And the ALJ reasonably accommodated this limitation by allowing Vrooman to switch positions between sitting and standing at will.

Accordingly, Vrooman has not demonstrated that the ALJ erred in rejecting Dr. England's opinion concerning Vrooman's sitting tolerance.

## III. The ALJ's RFC Assessment

Lastly, Vrooman argues that the ALJ's RFC assessment is incomplete because it does not account for non-exertional limitations related to his "well supported" cognitive impairment, his "well-documented" variable functioning (i.e., variable symptoms depending on whether he's having a "good" or "bad" day), or his "need for and reliance on a cane." *See* ECF No. 15 at 6–12. Vrooman maintains that these omissions are material, as a limitation to unskilled work would have resulted in a finding of disability as of his fiftieth birthday (April 10, 2016), the VE testified that all work would be precluded if he were off task twenty percent of the workday, and dependence on a cane may have significantly eroded the sedentary occupational base. *See id.*

Vrooman has not demonstrated that the ALJ erred in formulating his RFC. "In this circuit, 'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record.'" *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (quoting *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014)). *First*, the ALJ here reasonably determined that Vrooman did not suffer from a cognitive impairment that resulted in any specific functional limitations, let alone one that

14

rendered him capable of only unskilled work. Although Vrooman complained of ongoing bouts of dizziness and fogginess since his hardware-removal surgery in January 2014, the record shows that his complaints were not supported by any significant findings on neurological examination. *See* R. 18–19. For example, an MRI revealed only mild brain atrophy and lesions, R. 576–83, and Vrooman demonstrated good neurological functioning upon examination, R. 805–25. Moreover, the ALJ reasonably concluded that Vrooman's vestibular dysfunction—the medical diagnosis of his dizziness—improved with physical therapy and accommodated any lingering symptoms by limiting Vrooman's exposure to hazards and allowing only frequent balancing, no climbing of ladders, and only occasional movement of the neck—that is, stimuli that appeared to precipitate his dizziness episodes. *See* R. 15, 18–20.

*Second*, the ALJ explicitly considered that Vrooman complained of intermittent flares of pain and reasonably accommodated these symptoms by limiting him to a restrictive range of sedentary work. Vrooman criticizes the ALJ for not going further and including in the RFC limitations that accounted for his "bad days" and need for frequent breaks. As support, Vrooman cites his own statements and Dr. England's opinion that Vrooman would require breaks every one to two hours and may benefit from lying flat during times of rest. *See* ECF No. 15 at 9–10. But Vrooman has not demonstrated that the ALJ erred in evaluating his alleged symptoms or weighing Dr. England's opinion. Likewise, Vrooman implies without any support in the record that his variable functioning may result in him being off task twenty or more percent of the workday. And he doesn't propose any other specific functional limitations that would have resulted from his alleged variable symptoms. Notably, he is

apparently able to work twenty hours per week without being off task or needing to account for bad days.

*Third*, the ALJ reasonably did not add to his already restrictive RFC an accommodation for needing to use an assistive device. Although the ALJ noted that Vrooman used a cane to ambulate, R. 17, he also discussed Vrooman's ability to work twenty hours per week at Walmart, walk a total of six blocks carrying a tire, and walk two blocks to take out the garbage, R. 17–18. Even if the ALJ arguably should have included this limitation in the RFC assessment, any error in its omission is harmless. The ALJ determined that Vrooman was not disabled because he could perform his past job as a customer complaint clerk. R. 20–21. For that job, Vrooman worked in a call center handling complaints from disgruntled cellular-service customers. R. 40. The VE testified that many call center positions accommodated a sit/stand option because it increases productivity. R. 54. It seems likely then that these positions also would have accommodated Vrooman's need to use a cane during his times of standing or walking.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ did not commit reversible error in evaluating Vrooman's alleged symptoms, weighing the opinions of his treating provider, or

formulating his RFC. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 19th day of August, 2020.

STEPHEN C. DRIES
United States Magistrate Judge